Good morning, I'm John Bussey for the Appellants. Today we're dealing with a case that involves a severely endangered fish and two distinct legal issues under the Endangered Species Act, which I think I'll tend to refer to as the ESA throughout. The first is the Fish and Wildlife Service's decision that critical habitat for the stickleback should not be designated in September of 2002. We're seeking the reinstatement of a proposal to designate habitat for the stickleback and a remand to consider a new final designation consistent with the ESA's requirements. Now, with respect to our review of the refusal to designate habitat, it's pretty differential is it not? Discretionary? Arbitrary? Capricious? It's arbitrary and capricious in general. We're also alleging that the service failed to consider the plain language of the Act, so it's deferential to the extent that the language of the ESA is plain in that the critical habitat designation or revision must be made to the extent prudent and determinable. The second issue involves the service's authorization to take stickleback, to harm them, to kill them, in conjunction with a gravel mining project in the Santa Clara River. Despite a state law prohibiting take, we're asking that this take authorization, which came in an incidental take statement, be set aside as unlawful. I'd like to turn first to the critical habitat issue. When it amended the ESA in 1978 and again in 1982 to set deadlines and mandatory duties involving critical habitat designation, Congress placed great importance on the purpose of critical habitat designation for conserving and eventually recovering the species to healthy levels. At the time of the 1982 amendments, a proposed rule for designating stickleback habitat had been pending for two years, since 1980. Based on a transitional provision in the 1982 amendments, the pending designation for the stickleback was treated as a proposal to revise critical habitat. What this means is that the service had a mandatory duty to make a final determination on stickleback critical habitat no later than, I believe it was October of 1983. What we had instead was a decision 19 years later, in the midst of this litigation which had already commenced, to determine that critical habitat should not be designated for the stickleback. There's a few problems with this determination. First, a threshold question. Do you want to say anything about standing to raise this issue? In what sense, Your Honor? Well, to the extent that this is a discretionary decision, what establishes standing for your organization to intercede? Let me talk about that issue of discretion, because I think as raised by the government and by the intervener, the term discretionary is something of a red herring. There's no question that in 1980, the decision to propose and designate critical habitat for the stickleback was a discretionary one. With the operation of the 1982 amendments, and with the proposal that was then pending, and the operation of the transitional provision, a final determination on that proposal becomes a mandatory one. Now, much like any other decision that a government agency makes, the ultimate substance of that decision contains elements of discretion. But there's no question that there was a mandatory duty to make a determination. As with any challenge to the substance of a critical habitat designation, if we were arguing that it needed to include some areas and exclude others, for example, the ESA and the APA provide standing to challenge a final determination by an administrative agency to make such a final rule. And that's exactly what we're doing today. So there's no question in our minds that this was a matter that was committed to agency discretion and it was beyond our ability to challenge. We firmly believe that there is standing to challenge the substance of the agency's decision on this, what was ultimately a non-discretionary matter. Why do you say it was non-discretionary? If you go to the stand, I mean, I'll just pick up where you left off before you address standing, but under 1533A3, your argument, and to the maximum extent prudent and determinable, then there's subdivision A and then there's subdivision B. B has the word may from time to time thereafter as appropriate revised section. That's correct. How do you read maximum extent and prudent into that clause? The maximum extent prudent language applies in what used to be section A. I think it may be A1 now, but section A applies equally as we read it to determinations of critical habitat and revisions alike. There's a discretionary element to critical habitat revisions. It's a subdivision, and that makes sense. It may from time to time... You want to read maximum extent prudent and determinable basically to elevate this to almost a mandatory. We read it that way in light of the... What do you do with may? Well, the may was the original decision whether or not to revise or in this case designate critical habitat, but the transitional provision from the 1982 amendments makes clear that the procedures of section four of the ESA shall apply to those so-called revisions. The procedures then make the prudent and determinable language applicable to the ultimate decision, which is non-discretionary, to make a final determination as to stickleback critical habitat. The government's September 11, 2002 determination concedes this point. They indicate that we need to make a final determination on this, and here are the range of things that we can do. It's a mandatory decision at that point, and our contention is that mandatory determination is bounded by the prudent and determinable language from section A3. All right, so I guess you also would read that maximum extent prudent and determinable language also into 1533A6. B6, I believe. B6. Is that what it is? B6? I think there's no doubt that the prudent and determinable language applies to that section. That is... How do you... I have a hard time... Explain to me how you... Well, the B6 provision... I read your argument in your brief, but I didn't really follow it, all that. The B6 decision, the B6 determination applies to final critical habitat determinations of all kinds. For example, the just an ordinary, a routine decision for a species that wasn't subject to these transitional provisions to designate critical habitat. And A3 makes clear that that critical habitat designation, also governed by subsection B6, must be made to the maximum extent prudent and determinable. And it clearly applies to a routine decision to designate critical habitat. And there's no distinction, there's no basis in the statutory language for splitting out these final so-called revisions under the transitional provision and somehow exempting them from that. Except the plain language of the statute doesn't seem to support what you're saying. Well, I think then we have a different view of what the plain language says. I think the plain language in our reading says, may revise or shall designate to the maximum extent prudent and determinable. The transitional provision applies that to the final determination to designate critical habitat for this transitional species. I think we've covered the prudent and determinable concern. We also have noted that the decision to not designate must ultimately consider the best scientific information that's available as to the conservation of the species. Here that didn't happen with the September 11, 2002 determination. Not only did they fail to consider information that was developed in the recovery plan indicating that critical habitat designation was essential for conservation of the species, the decision actually removed an existing protective provision that was afforded by the proposed critical habitat designation. That is the section 7.8.4 conference requirement for species that have a proposed but not yet finalized pending determination. That is, action agencies must confer with the Fish and Wildlife Service as to the potential effect of a federal action on proposed critical habitat. That protection... Is that true in every case? That's true in every case that involves a potential for a project, a federal action, that may affect a proposed critical habitat designation. So it would apply, in your view, to the CEMEX project? It would apply in that instance. But not necessarily with respect to anything that led up to the separate application or the separate CEMEX project concern. Yes, and I think not only would it apply, I'd have to look back at the record on this, I think it actually was a consideration in that case that there was a conference in which the stickleback was considered. The critical habitat as well as the potential jeopardy of the species was considered. I'm not entirely positive on that issue, but that conference requirement should have kicked in in that instance as well. Did you address the notice argument that you gave, the notice and comment argument that you made? The fundamental issue with notice is not that there needed to be some process afforded for a final rule, as the appellees framed the issue. The question is whether the notice and opportunity to comment that was provided was adequate to ensure meaningful public participation in light of the timing and nature of the ultimate final determination. And here the Idaho Farm Bureau case is the most important case on this issue. In that case, there was a gap of some years, I believe five or six years, and a final rule that came out with some additional public hearings relatively close to the final rule. And the final rule did not differ much from the proposed rule. Here we have, I think, an extreme situation. Twenty-two years have passed since the proposed rule. And the final determination differs utterly from the proposal. It's a 180 degree turn that could... Now the initial, as I understand the statute, V5 deals with the initial designation, correct? That's of the proposed, of the proposal, yes. And V6 deals with... Finalization of that proposal. And it seems to be written, at least when I was reading this yesterday, it talks about notice in B6A i capital 3 and 4, but in 1 and 2 it just says final regulation. It doesn't talk about notice. What does that mean? Well, we're looking at... Is there a difference there? I don't know that there's a difference in referring to notice within B6 of the statute. We're going under rulemaking procedures and cases involving general rulemaking principles. Explain to me, from your perspective, what, I guess it's 8-4? Except as provided in paragraphs 5 and 6 of this subdivision, sections 553 of title 5 relating to rulemaking shall apply to any regulation promulgated to carry out the purpose of this chapter. What does that exception clause mean in there? I believe that the exception clause refers to notice requirements that kick in under particular provisions under subsection B6 if the ultimate determination involves a withdrawal of the rule, for example. I don't have that statute in front of me right now, but that's not the distinction that we're drawing in this case. We're ultimately arguing that per B4 that the APA procedures need to apply, and those are the same types of procedures that were relevant in the Idaho Farm Bureau decision. There's little to distinguish the court's admonition that the... ...overlook or not give consideration to B5 and B6. Because B5 for notice provisions is more elaborate than what the APA requires. At least when I read this, I'm certainly... These statutes are very... Every time I look at this stuff, I get all confused. In the Idaho Farm Bureau case, it was a B6 decision that was ultimately evolved. The leucine of a species, the Bruneau hot spring snail, and that's exactly where the court felt that the hearings and public comment opportunity had to be provided reasonably close in time to the final determination. That's what's relevant in this case, and we have a worst case scenario, I think, of the situation that court in that case warned about. Let me turn to the incidental take issue, if I may. I don't have a great deal of remaining time. There's a number of issues to touch on here. Basically, incidental take is a process where the service can immunize an applicant acting through a federal agency from take liability under the ESA. It's a safe harbor provision. The problem is that here, the service, in light of information indicating that the state had fully protected species laws that absolutely prohibit the take of species like the stickleback, acted to immunize CEMEX's action. That's something that they just can't do. They failed to consider the factor of whether the activity was otherwise lawful, despite the fact that the state law clearly prohibits take of that very same species for which they authorized the take of. But what is it when the service regulations that you suggest would place an affirmative duty to ensure compliance? It would appear that the Fish and Wildlife Service itself doesn't think it has that power. The regulations provide how the consultation is to occur and describe the relevant factors that must be considered in consultation in determining whether an action is incidental to the purposes of, the take is incidental to the purposes of the action. Here, those regulations set out a relevant factor to consider. Is the activity otherwise lawful? The service failed to consider that. That doesn't necessarily indicate that the service has this sweeping duty that the appellees weren't about to consider every possible ramification of an action that they're permitting. The way that the service applies that provision, that otherwise lawful consideration, is up to them. There's numerous ways to deal with that. But what we're concerned about here is a specific state statute prohibiting take, which was brought to, the fact that the state has these fully protected species laws was brought to the attention of the action agency, the service,  yet the service failed to consider that factor and ultimately immunized NX from take liability despite the indication the action was prohibited by state law. Council, you're down to about three minutes. I'd like to reserve the remainder of the time. Thank you. Council? Good morning. My name is Andrew Mergen. I'm here representing the Fish and Wildlife Service today. At council table with me is Michael Hassen and Kerry Shapiro who represents CEMEX. And I will be giving, Mr. Hassen will take about ten minutes of the time. You can share your time if you want. Yes. I'd like to start with, I think, a misstatement on the part of CBD's council with regard to the September 2002 finding. He suggested that the service conceded in that finding that it had a mandatory duty here. And if you look at their excerpts of record at page 1110, you will see very clearly that the service discussed its obligations here as discretionary. And that's Congress' choice. As you know from our briefs, and as the parties largely agree about the development of critical habitat in the Endangered Species Act, originally there was no requirement. A discussion of it emerged in 79. In 1982, a real substantive critical habitat requirement emerged in the statute. But Congress was clear that that need to designate critical habitat for listed species didn't apply to species listed before 1982. And so the service's obligation with regard to critical habitat, with regard to this species, is entirely discretionary. And the service's critical habitat determination here is entirely appropriate based on the plain language of the statute, as Judge Paya, as you indicated. The statute uses the phrase, may, from time to time. They were under no obligation to designate critical habitat for the stickleback. And as to the notice requirement, Judge Paya, as you've noted, again the plain language of the statute distinguishes between proposed rules and final rules and the procedures that are applicable. There's no, what opposing counsel refers to as a notice requirement, there's no notice requirement for this final rule. And accordingly, it's regrettable that there was this long period of time, but there was no requirement for the service to go any further. And that is especially true given really the reasons for the service's September 2002 determination and the reasonableness of that determination. They say basically three things. They say first, as I noted on page 1110, that their obligation is discretionary. Second, they note that the information is... That goes to standing, the issue that Judge O'Sullivan raised. And I just want to make sure I understand that. As I understood their argument, is that you had an obligation to make a determination. That's the final... I mean, if that's... That's the final sort of, you had an obligation to make a determination. In fact, you know, the statute said you had one year. Right. There was no penalty for that. Right, yes. You had one year. Somebody could sue, could have sued the service and said, you know, make your determination. But that apparently didn't happen here. Right. Isn't that really what he's talking about? If that's what counsel is saying, then I don't disagree. The statute, as you know, as we discussed in our brief, the 82 Act, the 82 ESA, applied the provisions for revision of critical habitat to proposals that were pending before 82.  The statute gives the service four choices with regard to that. They chose the choice that is a finding that they're not going to make, a critical habitat determination. And that determination is really reasonable in light of the discretionary nature of the determination, the staleness of the information, which really no one could possibly dispute, and the incredible constraints on the service's resources and its mandatory obligation with regard to those 475 other species. Perhaps I should, if there are no questions, perhaps I should turn to the challenge, to the ITS statement. Really what this boils down to, I think, is an argument about the meaning of the services, regulatory definition of incidental take, and whether it goes as far as CBD suggests. And our argument here is that we have, first of all, they suggest that we haven't consistently applied this definition. The services interpretation of this regulation is really that it puts people on notice that obtaining an incidental take statement is not a get-out-of-jail-free card for other applicable laws. It puts people on notice that all they have, if they follow the terms of the biological opinion, they have a safe harbor from Section 9 prosecution. They have never interpreted that regulation as imposing upon them a duty to look at a myriad of state laws and decide whether a project is lawful or not lawful under that proposal. Is that interpretation recorded any place in a regulation, a manual, or is that your litigation position? I think it's unfair to characterize it as a litigation position. We think that our interpretation is also consistent with this one line in the preamble language. The preamble of? Of the rule in 86. There's some preamble language. This is a language that says, and both parties cite it, and both the United States and CBD argue that the preamble language supports their interpretations. That preamble language states that otherwise lawful activities are those actions that meet all state and local requirements, except for the prohibition against taking in Section 9 of the Act. Now, CBD argues that this is a litigation position, and that it's a change, that for the first time in 20 years, we're advancing this interpretation of the regulation. I think the court can take notice of the fact that if that were the case, we would have seen this issue squarely presented before. There are 300 listed species in California alone, and California, as the parties have noted, has a regulatory scheme for the protection of its resident endangered and threatened species. No one has ever suggested, up until this point, that the service had an obligation to examine for itself the lawfulness of a proposed action under state or local law. It is fundamentally, and I think this is very important to stress, that it is fundamentally inconsistent with the structure of the Act itself, and the role of this provision. When the service engages in Section 7 consultation, the end result is this biological opinion. The goal is to avoid jeopardy to these species, to make a call straight up about whether or not jeopardy is to occur, and to look at reasonable and prudent alternatives that might avoid jeopardy. The service's role in this is that of a consulting agency. It's very important to understand that BLM, the action agency here, is absolutely not bound by this biological opinion, or the incidental, by the biological opinion. And they only get ITS coverage if they adhere to the reasonable and prudent alternatives, the terms of the biological opinion. But this is clear in the case law. It's discussed in Bennett v. Speer. It's discussed in this court's decision in the village of Akutan. It's made clear in the regulations at 50 CFR 402.15a. It makes no sense to adopt an interpretation of the regulation that CBD proposes, given this overall scheme, the overall role of the Fish and Wildlife Service as a consultant, not as an action agency. And frankly, and Judge Pais, I know that you heard argument in the Columbia River, you can appreciate how complicated some of these cases are, some of these biological opinions that cross state lines. Columbia River is one example. The Klamath, the Rio Grande, the Missouri River, very comprehensive biological opinions are developed for this. The plaintiff's position would have the service waiting at the end of the day to pass judgment on the lawfulness of the activities. And that just doesn't, it really just doesn't make any sense. The fact of the matter is, the reasonable and prudent alternatives that are developed, and that the action agency, generally they stick with, because they don't want to risk Section 9 liability. That informs the way the project develops later on. It informs the NEPA documents that are developed. The record of decision in this case was finalized two years after the biological opinion. I have two questions for you. One, just to follow up on this, and that is, I guess an incidental take statement, the ITS, the applicant or the service or the other agency is notified that there still has to be compliance with other laws? Is that basically what you mean? Well, yeah, there is. I mean, that's what the regulation does. The service is saying, the service interprets its regulation this way. We're giving you, if you adhere to the biological opinion, you can't be prosecuted under Section 9 for a take. But you are still obligated to meet the requirements of other applicable laws. The role of the ITS is very narrow. It insulates for take on Section 9. My other question, just getting back to this notice, I just want to make sure I understand the exception clause in A-4. Is it A-4 or B-4? I can't remember. B-4, I guess it is. The except is provided in paragraphs 5 and 6. As I understand that clause, basically, the APA requirements generally apply to the statutory provision. Right. To rulings and whatnot. But there's special provisions that apply to 5 and 6. Yeah, I think that's fair. And there's no APA requirement for notice and comment on the publication of a final rule. Even under the APA? Right. Which is what happened here. I mean, what the agency did is publish a final determination. And if it's helpful to the Court, I'll say just a word about Idaho Farm Bureau. I think the case is readily distinguishable. I mean, at issue in that case was whether or not the information developed by the U.S. Geological Survey and not really provided to the public, but what formed the basis for the service's determination, should go through some sort of notice and comment. And the language, I mean, the language, I don't think this is a decision that's writ large. I think that the panel, the Ninth Circuit, was very concerned about the particular facts of that case. Now, in this case, the bottom line determination here is really, we don't have to do this, and we don't have, it might be nice as a policy matter, but Congress didn't impose that obligation on the agency. And so what they're saying is we don't have the resources. This is a far cry from the Idaho Farm Bureau. Counselor, you have only seven plus minutes left for your side. And so I just make that observation. It's up to you to use the time. I will yield to my California colleagues. Thank you very much. Thank you, Your Honors. Michael Hess and also Kerry Shapiro is at counsel table for the intervener, Semex. Preliminarily, Your Honors, I'd like to stress an important point, and that is that this case does not involve any claimed technical deficiencies in the analysis of the BO or the ITS. The challenges that are brought are purely procedural. These are not, there is no claim that the BO itself has a mistake in it. Also, the BO states there will be positive benefits to the stickleback through the implementation of the reasonable and prudent measures that are incorporated into this project. This stretch of the Santa Clara River, for example, is infested, for lack of a better word, with an invasive non-native plant known as Arundo. It sucks up a great deal of water from the Santa Clara River. One of the RPMs is that Semex is charged with cutting the Arundo. It relieves a substantial water burden on the river. That benefits the stickleback. There is a severe risk of pollution because the prior mining operation went largely unregulated. Through the BO, Semex is responsible for remediating those risks so pollutants don't get into the water during storms or earthquakes. There are benefits to the plan that are consistent with the recovery plan for the UTS, the unarmored three-spine stickleback, as well as to other wildlife in the area. Judge Paez mentioned that this maximum amount of possible language is not in 1533. I don't see it either. I also had a difficult time following CBD's argument. As counsel noted, they followed the fourth element regarding determining a proposed revision should not be made. The problem we have here is that mining operations are like telephone poles. You need them, but you don't want them in your backyard. This area has been determined to be a regionally significant construction aggregate resource area. The BLM's decision to assist this area in getting the aggregate it needs for construction going forward, that this land should be used, is a positive thing for the area. The question then isn't these procedural issues, which I don't believe have any merit whatsoever. The question Judge Paez, you asked about, is this a litigation posture that the service has taken? We would stress that the obligation of showing that this is a litigation posture rests with the petitioner. The service has said this is our view. There is no evidence that they have ever taken a contrary view. It would be akin to designation of the AR. The action agency says this is what we considered. All the time people say, no, you should have included more, and the courts say it's your burden to show more should be in the AR. We're entitled to rely on the action agency saying this is what we considered. The service has said this has been our position. There is no evidence they've ever taken a contrary position. The otherwise lawful issue, I just have a world of trouble with, but even preliminary to that, you notice that the preamble of CBD's argument is an assumption that there is take under state law. We've pointed out in our briefs that that assumption is mistaken. There is no state interpretation that there is an absolute ban under 5515 for endangered species. There are several indications that that's not the case. We have the CDFG issuing permits prior to 1999 on takes of fully protected species. We have the subsequent enactment of CESA, which allows for the issuance of permits for the take of endangered species. The subsequent enactment of that would at the very least raise the inference of an implied repeal of 5515. Counsel, what do we do with this language in 5515A1, except it's provided in so-and-so. Fully protected fish or parts thereof may not be taken or possessed at any time. And, of course, it lists the stickleback. And one of the questions, Your Honor, is what is take? And under Young, the Court suggests that what that means is sport or commercial take, not coextensive with take under the ESA. There is no state determination that says what this means is you cannot ever take it. And if there was, if that interpretation is correct, it's clearly preempted by federal law where the ESA applies. That issue hasn't been litigated yet in the California courts, has it? Correct. Has the Department of California, what is it, Fish and Game, is that the agency? CDFG. Have they issued a permit yet? No, we've not gotten to that stage of getting to them, Your Honor. But... So you still have to go through that agency. That's correct. But what we do have, if you look at the recovery plan, we quoted in our brief the CDFG member, the team leader on the recovery, Mr. Suzuki, who says, thank goodness we've got a lot of stickleback in the summer. We can take them and transplant them places and if they die, it's okay. This is the recovery plan. That is part of the recovery plan. The recovery plan calls for obtaining and transplanting stickleback and lists the CDFG as a cooperating agency. It's in the record. That is the recovery plan. So for CBD, this is not CDFG coming before you and saying we're violating state law. It's not the state coming before you. CBD is saying we have an interpretation of state law that violates our interpretation of the ESA. It falls flat. The preemption argument that would come in here, and just to drive the point home, this case, it's fully protected. But, Your Honor, if this is permitted, why not for a threatened species? State law says we're not going to let you take a threatened species or it has nothing to do with endangered or threatened. It happens to be our state bird. If the limitation that the state can place on this is to somehow elevate itself to a super regulation on top of the ESA, how does the service, how do applicants ever get anything done without having to abandon the coherent national policy that Congress is after for makeshift state-by-state regulations? And that was an issue, Your Honor, Judge O'Scanlan, you raised earlier. Is this really something that we want to have regulated state-by-state-by-state in contrast to the case you had just before us? That can't be the intent of Congress. Imagine a project on Lake Tahoe where the same lake, same project on the Nevada and California side, is it truly subject to different regulations depending on the state laws that make them into play? Counsel, your time has expired. Thank you, Your Honor. Thank you very much. Mr. Busse, you have some reserve time. Yes, thank you. Makeshift or not, that tapestry of potentially more stringent state laws is exactly what's anticipated by Congress in the ESA's Savings Clause, Section 6. And that's precisely what is not preempted here. There's no intent to express, to preempt a more stringent state laws as California's fully protected species law is. Counsel, we have this additional authorities list. Apparently it's from your side. Is there anything we need to know about that? The case that was submitted today deals with an incidental take statement. It involves a failure to consider relevant factors under the biological opinion and take statement. It doesn't directly address the otherwise lawful issue, but we felt it was relevant for the failure to address relevant factor issue. Thank you. I want to be clear that the state's fully protected species law does not need to be interpreted by this Court. It's clear on its face. It absolutely prohibits take, meaning killing of the stickleback, which is what is anticipated with the federal incidental take statement in this case. We don't need to interpret state law. Have the California courts interpreted that provision? The 5515 provision, I don't believe that they have. I don't know of a case interpreting that. They have dealt with other fully protected species provisions and indicated that we're not just talking about hunting and fishing, for example. It prohibits take except for scientific and recovery purposes, which could be alluded to in the reference to moving stickleback. That's a conservation purpose. At issue here, fundamentally, is the Fish and Wildlife Service's definition of take, of incidental take. It's defying to include those activities that are otherwise lawful. In other words, the authorization to incidentally take an endangered species does not apply if the activity is not otherwise lawful. Here is a factor to consider by the Service in deciding whether to authorize incidental take. It's a factor that they ignored. Can they, for example, authorize take of stickleback knowing that the state law prohibits the take of that species? I think that's precisely the situation that we have here. We're not asking for a searching evaluation of every potentially applicable state and federal law. We're asking them to consider particularly this law, which prohibits the take in this circumstance. That's the narrow issue to consider here. They failed to do it knowing that this law was out there. It was brought to their attention by the Action Agency, the Bureau of Land Management. Do you agree with the opposing counsel's statement that there's no dispute with respect to the biological opinion itself? It has to do with the procedure under which this is being administered. Yeah, I agree with that characterization. It's a procedural concern, the application of a relevant factor by the Service. Counsel, unless it's extremely urgent, your time has expired. Well, it's always urgent, Your Honor, but your time has nonetheless expired. Thank you. We understand and we commend counsel on both sides for very, very thorough briefs and giving us quite a challenge to deal with this case. Thank you very much. The case just argued will be submitted for decision.
judges: Hall, O'scannlain, Paez